UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | No. |
| v. | : | |
| | : | **JURY TRIAL DEMAND** |
| SHIPPENSBURG UNIVERSITY OF | : | |
| PENNSYLVANIA | : | |

_____

**CIVIL ACTION COMPLAINT**

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to the Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

2. Pursuant to 28 U.S.C. § 1391, venue is properly laid in this judicial district because all off the acts and/or omissions giving rise to the claims set forth herein occurred in this Judicial District and Defendant is located in this Judicial District.

**PARTIES**

3. Plaintiff is an adult individual and citizen of Pennsylvania living at 9025 Deerfield Commons, Shippensburg, PA 17257. "Jane Doe" is a pseudonym to avoid public disclosure of the sexual harassment she suffered as set forth herein.

4. Defendant Shippensburg University of Pennsylvania is a public university in Shippensburg, Pennsylvania, and is part

of the Pennsylvania State System of Higher Education and is located at 1871 Old Main Drive, Shippensburg, PA 17257, which is located in Cumberland County, Pennsylvania, which is located in this Judicial District.

5. At all times material hereto, Defendant acted through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

**FACTUAL BACKGROUND**

6. Plaintiff is an adult female.

7. Plaintiff was accepted as a student in Defendant's Clinical Mental Health Master's Program and she commenced her studies in the fall semester of 2018.

8. As part of her admission package with Defendant, Plaintiff was offered a position as a graduate assistant to commence in August 2018, and plaintiff would receive compensation from Defendant including an hourly wage and tuition reimbursement to be used towards credits for completion of her Master's Degree with Defendant.

9. Plaintiff was at all times an excellent student and employee of Defendant and was very quickly promoted to the position of Director of Testing for Defendant.

10. At all times material hereto, plaintiff's direct supervisor was Dr. Jane Roe (Female) who was an Assistant Dean of Defendant's Office of Professional, Continuing, and Distance Education (hereinafter "OPCDE").

11. In about January 2019, Dr. Roe started to make overt sexual advances towards Plaintiff in that Dr. Roe propositioned Plaintiff to participate in a ménage à trois with her and a man.

12. Plaintiff rejected this sexual advance.

13. Shortly after the January 2019 proposition, Plaintiff approached the Dean of OPCDE to complain of Dr. Roe's sexual advance but before she could cite any details, the Dean told Plaintiff that she did not want to hear about it.

14. Thereafter, between January 2019 and the end of the school year in April 2019, Dr. Roe made advances towards Plaintiff between 2-4 times weekly, including repeating her proposition to engage in a ménage à trois, showing Plaintiff photographs and text messages of a sexual nature and flaunting details about her sex-life.

15. During this time period, Dr. Roe also continued to make inappropriate comments of a sexual nature at the workplace knowing that her comments would be heard by Plaintiff.

16. For example, Dr. Roe texted Plaintiff on March 11, 2019, "hey guess what I found out? Daniel thought the night we

invited him to the bar . . . he thought maybe we had [sic] a threesome . . ."

17. The following day, Plaintiff was approached by Dr. Roe in the computer lab and was again asked if she would consider having a threesome with Daniel.

18. Plaintiff rejected or otherwise rebuffed each and every one of Dr. Roe's sexual advances and it should be noted that Plaintiff played no part in inviting Daniel to a bar.

19. In March/April 2019, Plaintiff accompanied Dr. Roe on a business trip to Philadelphia.

20. During the Philadelphia trip, Dr. Roe asked Plaintiff to look at photographs on Dr. Roe's phone which showed Dr. Roe nude and engaging in activities as a dominatrix with various men.

21. Plaintiff told Dr. Roe that she "did not need to see these photos", at which point Dr. Roe responded with extreme disappointment to Plaintiff's rejection of the photographs.

22. After Plaintiff and Dr. Roe returned from the Philadelphia trip, Dr. Roe threatened Plaintiff's job, and warned her that she could suffer the same fate as the previous Director of Testing (who was terminated by Dr. Roe) if she did not respect and obey Dr. Roe because she was her boss.

23. Plaintiff understood this threat to mean that Dr. Roe was trying to intimidate her to not reject her advances.

24. Plaintiff again approached the Dean to complain of the incidents of sexual harassment during and after the Philadelphia trip.

25. The Dean again told Plaintiff she did not want to hear it because Dr. Roe was her friend.

26. After the regular school year ended, Plaintiff did not see Dr. Roe as often as during the regular school year.

27. However, during the late Spring and Summer months of 2019, Dr. Roe continued to make regular and pervasive sexual advances towards Plaintiff and made inappropriate comments of a sexual nature whenever the two were together.

28. In early to mid-August 2019, Plaintiff accompanied Dr. Roe to a work-related conference in New Orleans, Louisiana, and Dr. Roe asked for room key to Plaintiff's room "in case I want to visit in the middle of the night."

29. Plaintiff refused Dr. Roe's request.

30. About two days later and during the New Orleans trip, Dr. Roe told Plaintiff that she was going to go on a dating website to find a date and that she wanted Plaintiff to come on the date with her.

31. Plaintiff refused this sexual advance and firmly advised Dr. Roe that she had a boyfriend and did not do that kind of thing.

32. Dr. Roe was noticeably upset at Plaintiff's rejection of this proposition.

33. The following day, Dr. Roe confronted Plaintiff in front of other attendees of the New Orleans conference by yelling and cursing to Plaintiff that she would not have a job when she returned to Shippensburg.

34. Dr. Roe then left early from New Orleans alleging that she did not feel well, and might have to go to the hospital, and then she then abandoned Plaintiff in New Orleans.

35. After Plaintiff returned from New Orleans, she asked the Dean to work from home on August 12 and 13, 2019, because was not comfortable returning to workplace until she talked to her.

36. When Plaintiff returned to the office on August 14, 2019, she found that Dr. Roe told everyone that Plaintiff was no longer employed with Defendant.

37. Plaintiff again approached the Dean to explain to her what occurred during the New Orleans trip and the Dean again refused to hear her story.

38. On or about August 20, 2019, Plaintiff was called into a meeting with the Defendant's Vice President of Human Resources (hereinafter "VPHR") and the Dean to discuss accusations that she had engaged in "unprofessional behavior" during the New Orleans trip.

39. Plaintiff immediately explained that it was Dr. Roe who was unprofessional and that Dr. Roe was lying to protect herself and Plaintiff gave some of the details of the sexual harassment to which she was subjected by Dr. Roe.

40. The VPHR asked why she did not complain about Dr. Roe's behavior in the past, and Plaintiff looked at the Dean and said that she had tried.

41. The Dean did not deny that Plaintiff's had approached her to try to complain about Dr. Roe.

42. Plaintiff was told by the VPHR that the Defendant was going to end her employment.

43. Plaintiff never returned to the workplace and she received her last paycheck from Defendant on or about October 18, 2019, and her tuition benefits were discontinued at the end of December 2019.

44. At the time of the August 20, 2019 meeting, the VPHR also directed Plaintiff to put in a formal complaint of sexual harassment with the Defendant's Title IX Coordinator.

45. On or about August 22, 2019, Plaintiff made a sexual harassment complaint to Defendant's Title IX Coordinator.

46. Plaintiff sent in proof of harassment by attaching text messages sent to her by Dr. Roe and describing some of the harassment to which she was subjected.

47.  Dr. Roe was placed on leave by the Defendant and resigned her position in lieu of termination within several weeks after Plaintiff presented her evidence to the Title IX Coordinator.

48.  In November/December 2019, the VPHR, after learning of the evidence supporting Plaintiff's claims, said that he would reconsider reinstating plaintiff's employment with Defendant in some capacity and that he would contact her to make arrangements to do so, but he never did so to date.

49.  For the aforementioned reasons, Plaintiff has suffered, and will in the future suffer, damages including but not limited to lost pay, lost tuition benefits and other benefits, emotional pain and suffering, attorney's fees and costs.

50.  Defendant's management officials acted with intentionally and with malice and with blatant disregard for Plaintiff's civil rights in terminating Plaintiff, refusing to reinstate her employment, taking away her tuition benefits and engaging in other discriminatory and retaliatory acts.

**COUNT I-- Violation of Title IX-- Quid Pro Quo Sexual Harassment**

51. The foregoing paragraphs are incorporated herein as if set forth in full.

52. Dr. Roe was the Assistant Dean and had significant, if not controlling, input on Plaintiff's success as a graduate assistant and/or Director of Testing.

53. Dr. Roe wanted to engage in a sexual relationship with Plaintiff during Plaintiff's educational program.

54. Plaintiff repeatedly rejected Dr. Roe's advances.

55. Dr. Roe thereafter engaged in a series of acts designed to threaten and end Plaintiff's education-related employment with Defendant.

56. Dr. Roe acted within the scope of her educational duties in retaliating against Plaintiff.

57. Dr. Roe made a complaint against Plaintiff that led directly to the decision to terminate Plaintiff from her education-related employment with Defendant.

58. Dr. Roe recommended that Plaintiff be removed from her education-related employment with Defendant, and provided false charges against Plaintiff in order to do so.

59. Defendant and its agents acted as a cat's paw and rubber stamp for Dr. Roe's decision to remove Plaintiff from her education-related employment with Defendant.

60. These actions constitute quid pro quo sexual harassment against Plaintiff under Title IX of the Education Amendments Act of 1972.

**COUNT II--Intentional Infliction of Emotional Distress
(Pennsylvania common law) (Respondeat Superior)**

61. The foregoing paragraphs are incorporated herein as if set forth in full.

62. Dr. Roe's actions in repeatedly subjecting Plaintiff to unwanted sexual advances were extreme and outrageous.

63. Dr. Roe's act of retaliating against Plaintiff by threatening her employment and lying that Plaintiff had been unprofessional so that Plaintiff would be removed her from her contract of employment with Defendant constitutes extreme and outrageous conduct.

64. Plaintiff suffered severe emotional distress as a result of Dr. Roe's actions.

65. Dr. Roe performed her actions within the scope of her employment with Defendant as the Assistant Dean of OPCDE.

66. Dr. Roe's actions constitute tortious intentional infliction of emotional distress under Pennsylvania common law.

67. Defendant is liable for the tortious intentional infliction of emotional distress committed by Dr. Roe against Plaintiff because it employed Dr. Roe as the Assistant Dean of OPCDE.

**COUNT III Negligent Supervision (Pennsylvania common law)**

68. The foregoing paragraphs are incorporated herein as if set forth in full.

69. Defendant failed to exercise ordinary care in preventing Dr. Roe's intentional harassment and retaliation against Plaintiff.

70. Some of Dr. Roe's intentional harassment and retaliation against Plaintiff occurred on Defendant's premises.

71. Defendant's agent Dean of OPCDE, intentionally would not hear complaints made by Plaintiff concerning Dr. Roe.

72. Defendant's agent Dean of OPCDE, knew that Dr. Roe had engaged in sexually harassing activities before Plaintiff was admitted to Defendant's educational program.

73. Defendant was on notice of the need to control Dr. Roe because of her knowledge of Dr. Roe's past sexual harassment and Plaintiff's repeated attempts to complaint to her about Dr. Roe's conduct.

74. Plaintiff has suffered damages as a result of Defendant's actions and/or lack of actions in supervising Dr. Roe.

**WHEREFORE,** Plaintiff prays that this Court enter an Order providing that:

1. Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of harassing, discriminating, and retaliating against employees and students and is to be ordered to promulgate an effective policy against such unlawful activities and to adhere thereto;

2. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions.

3. Plaintiff is to be awarded punitive damages, as permitted by applicable law, to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other educational institutions/employers from engaging in such misconduct in the future;

4. Plaintiff is to be accorded damages for emotional distress and/or pain and suffering and any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

5. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

6. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.

/s/ Samuel A. Dion
_____
Samuel A. Dion, Esq.
Dion & Goldberger
1845 Walnut Street, Ste. 1199
Philadelphia, PA 19103
215-546-6033 (tel)
215-546-6269 (fax)
samueldion@aol.com
Attorneys for Plaintiff