IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, | : | |
| Plaintiff | : | No. 1:20-CV-1416 |
| | : | |
| v. | : | Judge Brann |
| | : | |
| SHIPPENSBURG UNIVERSITY OF PENNSYLVANIA, | : | Electronically Filed Document |
| | : | |
| Defendant | : | *Complaint Filed 08/11/20* |

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff was a student employee of Shippensburg University of Pennsylvania ("Shippensburg"). She brought claims stemming from alleged sexual harassment by her supervisor against Shippensburg in this civil action. As further stated below, Shippensburg did everything that it could to prevent harassment and had various anti-harassment policies in place, which Plaintiff admitted she was well aware of, and she could have made a formal complaint at any time. Plaintiff, however, failed to put Shippensburg on notice that she felt she was being sexually harassed by her supervisor until after she was informed her employment was being ended. The representatives she reported her concerns to immediately referred the matter for investigation and her supervisor was placed on leave, but nothing would have changed the decision to end Plaintiff's employment. For these reasons, Plaintiff's claims fail and judgment should be entered in favor of Shippensburg.

1

## RELEVANT PROCEDURAL HISTORY

Shippensburg answered the complaint. Discovery is closed. Shippensburg filed a motion for summary judgment with a statement of undisputed material facts and an exhibit list, which included changed names to protect the confidentiality of Plaintiff's name as well as others. Shippensburg will separately file a motion to seal filings and exhibits to enable the Court's review of the fact statement, brief, and exhibits with the actual names of the relevant persons therein. Shippensburg files this brief in support of the motion for summary judgment.

## STATEMENT OF ALLEGED FACTS

Pursuant to this Court's Local Rule 56.1, Shippensburg filed a separate Statement of Material Facts contemporaneous to its Motion for Summary Judgment. The facts are presented in a light most favorable to Plaintiff as required and are submitted for purposes of summary judgment only. Shippensburg cites to the facts, transcripts, declarations and attachments at appropriate points in this brief.

## QUESTIONS PRESENTED

1. Was Shippensburg deliberately indifferent to a claim of sexual harassment by Plaintiff when it did not have actual notice of the alleged discrimination until after the decision was made to end her employment and it took immediate remedial action upon learning of the complaint?

2. Should judgment be granted in Shippensburg's favor because it would have made the same decision to end Plaintiff's employment contract regardless of Dr. Roe's reports of her behavior?

3. Was Plaintiff deprived of access to educational opportunities or benefits provided by the school due to the alleged harassment?

4. Is Shippensburg shielded by sovereign immunity from the state law claims as a state entity?

## ARGUMENT

Title IX applies the same prohibition as Title VII to recipients of federal funds. 20 U.S.C. §1681(a). "Following the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases, lower courts have adopted the Title VII framework to analyze Title IX [] claims." *Atkinson v. Lafayette Coll.*, 653 F.Supp.2d 581, 594 (E.D.Pa. 2009). This means claims are analyzed under burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"The operative elements of a *prima facie* hostile work environment claim [under Title IX] are otherwise essentially the same [as under a Title VII claim], other than that "a plaintiff must [also] prove that the employer was deliberately indifferent to a report of discrimination ... [which] is more stringent than the negligence standard that applies under Title VII." *Kahan v. Slippery Rock Univ. of Pa.*, 50 F.Supp.3d 667, 697 (W.D.Pa. 2014). To proceed on a claim against an

educational institution under Title IX, the student must establish that the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). *See also Yan Yan v. Penn State Univ.*, 529 F.Appx. 167, 171 (3d Cir. 2013).

### A.  SHIPPENSBURG DID NOT HAVE ACTUAL NOTICE OF THE ALLEGED DISCRIMINATION UNTIL AFTER THE DECISION WAS MADE TO END PLAINTIFF'S EMPLOYMENT AND IT TOOK IMMEDIATE REMEDIAL ACTIONS UPON LEARNING OF THE COMPLAINT.

Recovery based on the principles of *respondeat superior* or constructive notice "frustrate[s] the purposes" of Title IX, and therefore the school official must have <u>actual knowledge</u> in order for the plaintiff to prevail. *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 285 (1998) (emphasis added); *see also, id.* at 290 (holding that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.").

Actual notice requires more than a simple report of inappropriate conduct. *Escue v. Northern OK College*, 450 F.3d 1146, 1154 (10th Cir. 2006) (quoting *Doe*

*v. Sch. Admin. Dist. No. 19*, 66 F.Supp.2d 57, 62 (D.Me. 1999)). While actual knowledge does not require absolute certainty that harassment has occurred, there must be more than an awareness of a mere possibility of the harassment. *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005). The educational institution has "'actual knowledge' **when it knows the underlying facts**, indicating sufficiently substantial danger to students, and was therefore aware of the danger." *Id.* at 361 (emphasis added).

Furthermore, the "actual notice" or "actual knowledge" must be attributed to an "appropriate person." *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 169 (3d Cir. 2002) (*quoting Gebser*, 524 U.S. at 290). An "appropriate person" is one who, at minimum, "has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" to end this discrimination. *Gebser*, 524 U.S. at 290.

Upon a showing of actual knowledge by an appropriate person, Plaintiff must show that the funding recipient exercised deliberate indifference. A funding recipient is "deliberately indifferent" when the recipient's response to the harassment, or lack of response, is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648-649. Thus, deliberate indifference requires an "official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.

Here, Plaintiff never reported her concerns to any "appropriate" persons until after her employment was being ended, and as soon as Dr. Topper and the Dean heard about her concerns in the meeting, they immediately referred the matter to the proper office for investigation, and Dr. Roe was placed on leave. (Topper[1] at 47:18-48:12, 51:4-6, DEF000001, DEF000165). Prior to the meeting where she was notified her employment was ending, she reported her concerns only to colleagues and friends, who encouraged her to report her concerns to an appropriate authority figure but were not required to forward her concerns on to anyone and, moreover, only had second hand information and no direct knowledge of any harassment. (Pl. Depo.[2] at 48:1-2, 52:6-53:1; Exhibit 13 at p.7 - DEF000136). Despite this, Plaintiff never explicitly informed anyone who was in an authority position, including faculty members who were mandatory reporters, about her concerns prior to her contract being ended. (Pl. Depo. at 52:24-53:1). She admitted she never told anyone because thought she could handle it on her own. (Dean[3] at 84:22-85:2). Even later, she only brought up the subject with Dr. Topper and the Dean in an attempt to try to save her contract from ending early. (Dean at 84:4-22, Topper at 44:22-45:7).

---

[1] "Topper" refers to the Deposition of Dr. Topper, a true and correct copy of which is enclosed as Exhibit 4.
[2] "Pl. Depo" refers to the Deposition of Plaintiff, a true and correct copy of which is enclosed as Exhibit 1.
[3] "Dean" refers to the Deposition of the Dean, a true and correct copy of which is enclosed as Exhibit 2.

Plaintiff complained to the Dean about Dr. Roe's strong management style at times, but the Dean never had a reason to believe that Plaintiff's concerns amounted to anything more than typical workplace strife stemming from Dr. Roe's management style. (Dean at 85:3-8; Pl. Depo. at 51:5-11). For instance, Plaintiff addressed an email that was sent by Dr. Roe that she believed was not received well with the Dean, and the Dean asked to see the email so she could look into the matter. (Dean at 38:17-39:8).

Plaintiff never notified the Dean, however, that she felt she was being sexually harassed. She testified she *tried* to tell the Dean, but that she was ultimately unable to relay any of the underlying facts or details to her.[4] On one occasion, at the Dean's poolside when it was just the two of them, she does not recall what specifically she said to the Dean beyond telling her she was put in awkward situations by Dr. Roe and felt she couldn't go against her wishes because she would be malicious, but she knows she kept trying to relate the conversation to work. (Pl. Depo. at 48:6-14, 49:5-6). She felt like she was crossing the line though

---

[4] It should be noted that Plaintiff knew Dr. Roe thought they were friends, she had brought coffee for her on various mornings, they spent a lot of time together outside of work, and Plaintiff admitted she was not very specific her when she wanted to tell her she was uncomfortable with the situation – she testified she tried to put it in a "fun kind of way" and she tried to hide instead of facing her. (Cooke at 20:4-17, 22:21-24, 51:12-52:5). Thus, it is unclear whether Dr. Roe even understood that Plaintiff was uncomfortable with their conversations about her personal life, as reflected in the final investigation report by Shippensburg staff. (Exhibit 13 at p.13, DEF000142).

and decided to back off from the conversation. (Pl. Depo. at 47:3-18). She admitted she let it go after that and chose to confide in a coworker instead, who was a friend who had *previously* worked in human resources, and as such, was not required to pass along Plaintiff's concerns. (Pl. Depo. at 48:1-2).

The first time that anyone in authority at Shippensburg learned there were sexual harassment concerns was when Plaintiff's contract was being ended. the Dean never heard complaints from students or staff about Dr. Roe prior to Plaintiff's position ending early and was "completely blown away" because she had no idea that there was any claim of sexual harassment. (Dean at 5:22-6:6, 50:21-51:1, 85:3-8). If she had known anything previously, she would have reported it to the social equity office "the minute" she knew anything. (Dean at 20:1-14).

In sum, Shippensburg never had actual notice of the underlying facts of Plaintiff's claim until her employment was being ended and never made an official decision not to remedy the violation. Instead, as soon as an "appropriate person" learned of Plaintiff's complaints, it took immediate remedial action to refer the matter to the correct office, open an investigation, and place the alleged aggressor on leave. Therefore, Shippensburg was not deliberately indifferent to sexual harassment, and judgment should be entered in its favor.

    **B.**    **SHIPPENSBURG HAD CONCERNS STEMMING FROM HOW PLAINTIFF'S BEHAVIOR MIGHT AFFECT ITS REPUTATION**

**OUTSIDE OF DR. ROE'S REPORTS AND WOULD HAVE MADE THE SAME DECISION TO END HER EMPLOYMENT.**

An employer cannot be held liable if it can prove that it would have come to the same conclusion regarding a particular person even in the absence of alleged discrimination. *See Watson v. Se. Pennsylvania Transp. Auth.*, 207 F.3d 207, 215 (3d Cir. 2000) (*citing Price Waterhouse v. Hopkins*, 409 U.S. 228, 242 (1989). *See also Tanca v. Nordberg*, 98 F.3d 680, 681 (1st Cir. 1996) ( "Put another way, the Court held that it was an affirmative defense to a charge of unlawful intentional discrimination to show that the employer would have made the same decision even in the absence of an unlawful motive.").

The evidence proves that the same decision to terminate Plaintiff's employment would have been made regardless of any alleged wrongful intent by Dr. Roe. Plaintiff's position was a temporary position, and it was going to end at some point in the near future anyway. (Topper at 42:17-19). Prior to the New Orleans conference, the Provost had already been trying to decide whether to extend Plaintiff's contract. (Dean at 57:11-16).

As Plaintiff's employment continued, the Dean heard reports of "a series" of concerning behaviors by Plaintiff. (Dean at 53:4-9). Some of the concerning behavior was brought to her attention by people other than Dr. Roe. (Dean at 54:22-55:7). After a "First Friday" event, Dante Truss, an African American man and Vice President of Shippensburg, had expressed concerns to the Dean about

Plaintiff being intoxicated and following him around to "bug him" at a First Friday event. (Topper at 27:8-24, 31:15-21, 63:23-64:3). Alex Rouly had called the Dean about the First Friday event too. (Topper at 31:3-9, 37:5-9).

the Dean knew of a time where a wellness check was made for Plaintiff after she did not show up for work, sent an email that was very out of character for her, and they felt compelled to call the police to check on her. (Dean at 53:15-16, DEF000435; Roe[5] at 27:13-21). the Dean also knew of a prior trip to Philadelphia in March or April for a testing event where Plaintiff did not go back to the hotel the night before the event, and it was uncertain whether she was going to show up for the event. (Dean at 53:13-24, 54:9-12).

Plaintiff's behavior at the conference was the final straw for the Dean. (Dean at 29:10-18, 54:13-21). During the New Orleans conference, the Dean was concerned with Plaintiff's behavior because of a racist comment at dinner with a representative from another school, coupled with the prior complaint by an African American man, and because she found Plaintiff's behavior throughout the evening to lack professionalism when she was acting as a representative of Shippensburg. (Dean at 74:4-14). Dr. Long's communications to Dr. Topper and the Dean confirmed that Plaintiff's behavior at dinner was "quite alarming." (Dean at 58:24-59:4).

---

[5] "Roe" refers to the Deposition of Dr. Roe, a true and correct copy of which is enclosed as Exhibit 3.

Based on these events, the Dean was concerned with the accumulation of inappropriate behavior by Plaintiff and the pattern being established and worried it would adversely affect Shippensburg's reputation. (Topper at 30:6-13). the Dean's focus was on mitigating risk to Shippensburg and its reputation. (Dean 54:1-2). By the time that Plaintiff brought her concerns to the attention of Dr. Topper and Dean, the decision to change her employment had been made, and Dr. Topper indicated that nothing she could tell them at that point would change the decision. (Dean at 84:14-22).

Thus, the Dean and Dr. Topper had concerns about how Plaintiff was representing the school outside of what Dr. Roe reported, and they would have made the same decision to end Plaintiff's contract. For this reason, Shippensburg is entitled to judgment in its favor because Dr. Roe had no effect on Plaintiff's contract ending early and the same decision would have been made to end the contract.

### C. PLAINTIFF ADMITTED SHE WAS ALWAYS ABLE TO COMPLETE HER JOB DUTIES AND THEREFORE WAS NEVER DEPRIVED OF ACCESS TO BENEFITS PROVIDED BY THE SCHOOL.

To proceed on a claim against an educational institution under Title IX, the student must establish that the institution was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the

11

educational opportunities or benefits provided by the school." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). *See also Yan Yan v. Penn State Univ.*, 529 F.Appx. 167, 171 (3d Cir. 2013).

Here, Plaintiff was never deprived of benefits at Shippensburg. She kept the same benefits that she would have been afforded regardless of the alleged harassment. Even after her employment ended, which was a temporary assignment and was to end anyway, she stayed on the payroll for an additional two weeks and her tuition waiver remained in place through the end of the semester. (Topper at 38:6-11, 42:17-19, 59:13-17). Plaintiff could have applied for another graduate assistant position but never did. (Dean at 86:17-21).

Also, Plaintiff's academic classes were not adversely affected. Plaintiff maintained an A average throughout all of her courses before and after working in the testing center. (DEF000002). Moreover, Plaintiff asserted she was never prevented from completing her job duties. She was dedicated to her position and was a hard worker, put in extra hours, and was fully completing all of her job duties the entire time that she was in her position even despite what happened with Dr. Roe. (Pl. Depo. at 18:14-19:4). So Plaintiff did not suffer circumstances that were so severe, pervasive, or offensive that she was prevented from completing her duties.

Therefore, Shippensburg was not deliberately indifferent to sexual harassment that was so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school, and it is entitled to judgment in its favor on this basis.

### D. AS A STATE ENTITY, SHIPPENSBURG IS SHIELDED BY SOVEREIGN IMMUNITY FROM THE STATE LAW CLAIMS.

Plaintiff brings state law claims of intentional infliction of emotional distress through respondeat superior and negligent supervision against Shippensburg. Even if the Court exercises supplemental jurisdiction over any state law claims, which it may refuse to do pursuant to 28 U.S.C. § 1367(c)(3), the Eleventh Amendment to the Constitution exemplifies a broad rule of state sovereign immunity. Pursuant to the Eleventh Amendment and Pennsylvania's sovereign immunity statute, Commonwealth personnel are immune from liability for intentional torts. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *Foster v. McLaughlin*, 203 F.Supp.3d 483, 488 (E.D. Pa. 2016). Shippensburg, the only defendant in this case, is a state university and is part of the Pennsylvania State System of Higher Education, which Plaintiff admits. (Doc. 1 ¶4). As a state university, Shippensburg is entitled to sovereign immunity from state law claims except in nine narrow

categories of negligence cases where immunity has been waived by the legislature. *See* 42 Pa. Cons. Stat. § 8522(b).[6]

Sovereign immunity protection is undeniably broad and even applies to intentional torts committed by employees; "[u]nlike employees of municipal agencies who remain liable for intentional torts, employees of Commonwealth agencies are immune from liability even for intentional torts. *Mitchell v. Luckenbill*, 680 F.Supp.2d 672, 682 (M.D. Pa. 2010) (*citing Dill v. Oslick*, No. Civ. A. 97-6753, 1999 WL 508675, at *4 (E.D. Pa. July 19, 1999)).

Thus, even if Plaintiff's claim might amount to willful misconduct by her supervisor, Shippensburg is still within the umbrella of immunity provided by 1 Pa. C.S.A. § 2310." *Brautigam v. Fraley*, 684 F.Supp.2d 589, 594 (M.D. Pa. 2010). Claims against Commonwealth officials for the officials' intentional acts committed within the scope of employment are nonetheless barred by sovereign immunity. Thus, the "willfulness" of any staff conduct in the instant matter is immaterial.

As such, sovereign immunity bars the state law tort claims against Shippensburg, and it is entitled to judgment on the state law claims.

---

[6] The nine categories of cases for which immunity has been waived are vehicle liability; medical-professional liability; care, custody and control of personal property; Commonwealth real estate, highways and sidewalks; potholes and other dangerous conditions; care, custody and control of animals; liquor store sales; National Guard activities; and toxoids and vaccines. 42 Pa. Cons. Stat. § 8522(b).

## CONCLUSION

Defendant respectfully requests that the Court grant this motion and enter summary judgment in their favor.

                              **Respectfully submitted,**

                              **JOSH SHAPIRO**
                              **Attorney General**

                      **By:**   *s/ Lindsey A. Bedell*
                              **LINDSEY A. BEDELL**

**Office of Attorney General**      **Deputy Attorney General**
**15th Floor, Strawberry Square**  **Attorney ID #308158**
**Harrisburg, PA 17120**
**Phone: (717) 772-3561**          **KAREN M. ROMANO**
                                          **Chief Deputy Attorney General**
**lbedell@attorneygeneral.gov**    **Chief, Civil Litigation Section**

**Date:   August 9, 2021**          *Counsel for Defendant Shippensburg*
                                          *University of Pennsylvania*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANE DOE, | : | |
| Plaintiff | : | No. 1:20-CV-1416 |
| | : | |
| v. | : | Judge Brann |
| | : | |
| SHIPPENSBURG UNIVERSITY OF PENNSYLVANIA, | : | **Electronically Filed Document** |
| | : | |
| Defendant | : | *Complaint Filed 08/11/20* |

## CERTIFICATE OF SERVICE

I, Lindsey Bedell, Deputy Attorney General for the Commonwealth of Pennsylvania, Office of Attorney General, hereby certify that on August 9, 2021, I caused to be served a true and correct copy of the foregoing document titled **Brief in Support of Motion for Summary Judgment** to the following:

## VIA ECF

Samuel Dion, Esquire
Dion & Goldberger
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103
samueldion@aol.com
*Counsel for Plaintiff*

                                         *s/ Lindsey A. Bedell*
                                         **LINDSEY A. BEDELL**
                                         Deputy Attorney General